## AFFIDAVIT OF ERIKA BROADHURST

I, Erika Broadhurst, being duly sworn, hereby state as follows:

1.      I am a Special Agent for the U.S. Department of Health and Human Services,

Office of Inspector General (HHS-OIG), currently assigned to the Boston Regional Office in

Boston, Massachusetts.  I have been employed as a Special Agent for HHS-OIG since March

2007.  Before becoming a Special Agent, I was an analyst with HHS-OIG for more than five

years.

2.      In March 2007 I completed the Criminal Investigator Training Program at the

Federal Law Enforcement Training Center (FLETC) and the Inspector General Academy at

FLETC.  In June 2007, I completed the Special Agent Basic Training Program at FLETC.  In

2001 I received a Bachelor's Degree in Business Administration with a concentration in Health

Systems Management from the University of Connecticut.  In 2006, I received a Master's Degree

in Public Health from Boston University.  As a Special Agent with HHS-OIG I have investigated

numerous allegations of fraud involving programs administered by the U.S. Department of

Health and Human Services.  I have also participated in the execution of numerous search

warrants related to allegations of health care fraud.

3.      I am currently assigned to the HHS-OIG Office of Investigations, Boston

Regional Office, and am responsible for investigating allegations of health care fraud occurring

in government-sponsored health care benefit programs such as Medicare and Medicaid, and for

investigating violations of Federal statutes by individuals or entities that affect HHS programs,

providers, grantees, contractors and/or employees.  As a result of these investigations, I have

reviewed and analyzed financial documents, including bank, credit card, payroll, and billing

records.  I have participated in numerous such investigations and have assisted in the execution

of search and arrest warrants.  I have also participated in numerous witness and subject

interviews.

4.       My health care fraud experience also includes investigating physicians who are

involved in drug diversion by prescribing narcotics outside the scope of normal medical practice

to individuals with no legitimate need for the narcotics, many of whom engage in drug seeking

behavior.  These types of investigations may target doctors who knowingly provide prescriptions

for opiates or opioids (hereinafter collectively referred to as "opiates") to patients requesting

them, even though there is no legitimate medical need for them.  These investigations also

include doctors who have not complied with the provisions of the Controlled Substances Act, 21

U.S.C. § 801 *et seq.* ("the CSA").  For example, I have participated in investigations of

physicians who diverted controlled substances for their personal use, dispensed controlled

substances without prescriptions, failed to document the receipt or dispensing of controlled

substances, or wrote unnecessary prescriptions.

5.       Along with other Special Agents and Task Force Officers from the Drug

Enforcement Administration (DEA), and with investigators from the New Hampshire Office of

the Attorney General, Medicaid Fraud Unit, I am conducting an investigation into potential

violations of 18 U.S.C. § 1347 (Health Care Fraud) and 21 U.S.C. § 841(a)(1) (Dispensing of

Controlled Substances) (collectively, the "Target Offenses"), by Dr. John Fothergill of North

Country Medical & Wellness in Colebrook, NH.

6.       The information set forth in this affidavit is based on my personal participation in

this investigation, as well as my training and experience, information received from other law

enforcement officers, including their direct examination of relevant documents, reports of

interviews with witnesses in this investigation, electronic surveillance, and physical surveillance

conducted in connection with persons and places mentioned in this affidavit.  I have not set forth

every detail I or other law enforcement agents know about this investigation, but have simply set

forth facts that I believe are sufficient to establish probable cause for the issuance of the

requested warrant.

7.      Based on my training and experience, investigators search for certain "red flags"

when investigating doctors who appear to be prescribing narcotics outside the scope of legitimate

medical practice. To be valid, a prescription for a controlled substance must be issued for a

legitimate medical purpose by a practitioner acting in the usual course of professional practice.

These "red flag" behaviors often suggest both drug diversion and health care fraud violations.

Some of these "red flags" include the following:  (a) brief, cursory medical examinations, or in

some cases, none at all; (b) cash-only transactions, even if a patient has health insurance; (c)

prescribing multiple drugs within the same category (*e.g.*, pain killers); (d) elevating the dose of

a controlled substance or changing the prescription from a weaker controlled substance to a

stronger controlled substance without a legitimate medical need; (e) a lack of diagnostic testing;

(f) failing to refer patients to specialists for treatment; (g) failing to treat patients with anything

other than controlled substances (*e.g.*, the doctor never recommends physical therapy, surgery,

massage therapy, etc.); (h) failing to heed warnings about patients by others (insurance

companies, pharmacists, family members, nurses, doctors, or physicians assistants); (i) ignoring

toxicology results that show a patient is taking illegal drugs or other non-prescribed drugs; (j)

ignoring toxicology tests that are negative for prescribed medication, indicating that a patient

may be selling his medication; (k) failing to examine the area identified by the patient as

allegedly requiring pain management; (l) ignoring the condition, physical appearance, or

behavior of patients, which would create suspicion of drug addiction in the mind of a reasonable physician or pharmacist; (m) patient deaths; (n) writing prescriptions for a patient who admits to buying prescription pills off the street; (o) providing refills before prescriptions should have run out; (p) practices in which the vast majority of patients (75+%) are treated solely with controlled substances; (q) directing patients to particular pharmacies to fill their prescriptions and/or warning them to avoid other pharmacies; (r) pre-populating patient charts; (s) incomplete patient records; (t) continuous prescribing of narcotics even where toxicology results are still pending; and (u) prescribing inappropriate and dangerous combinations of drugs to patients.

8.      In this ongoing federal criminal investigation, I submit this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure authorizing a search for records I have reason to believe are currently in the possession of the New Hampshire Prescription Drug Monitoring Program ("PDMP").

9.      Through my training and experience as a Special Agent, I am aware that the PDMP is a web-based tool to help combat the ongoing prescription drug abuse epidemic in New Hampshire.  It assists healthcare professionals in their prescribing and dispensing decisions by providing a comprehensive picture of the patient's controlled substance prescription history. Prescribers and dispensers are required to query a patient's prescription history and to enter detailed prescription information when prescribing schedule II-IV controlled substances.  One of the functions of the PDMP is to promote public health and safety by allowing prescribers to detect and address potential substance misuse in their patients and ultimately lead to fewer unnecessary prescriptions being written.

10.      NH RSA 318-B:33 outlines the information that must be recorded in the PDMP. Prescribers are required to report dispensing information when they prescribe schedule II-IV

controlled substances.  NH RSA 318-B:35 states that in order for law enforcement to obtain

PDMP data, law enforcement must obtain a court order based on probable cause.[1]

11.     As shown in this Affidavit, there is probable cause to believe that the PDMP's

comprehensive records and data regarding Dr. Fothergill's prescription practices, for the period

December 1, 2017, through the present, including the kinds of controlled substances he has

prescribed; the number of prescriptions he has written; the quantities, dosages, and combinations

of drugs prescribed; and other associated data required to be kept in the PDMP; constitute

evidence of the offenses of health care fraud and the unlawful dispensing of controlled

substances.

<b>STATUTORY AUTHORITY</b>

12.     Title 21, United States Code, Section 841(a)(1) prohibits, among other things, the

unauthorized knowing and intentional distribution or dispensing of a controlled substance.  Title

21, United States Code, Section 802(10) provides that the term "dispense" includes the

prescribing of a controlled substance.  Title 21, United States Code, Section 821 authorizes the

Attorney General to promulgate rules and regulations relating to the dispensing of controlled

substances.  Title 21, Code of Federal Regulations, Section 1306.04 governs the issuance of

prescriptions, and provides that a prescription for a controlled substance "must be issued for a

legitimate medical purpose by an individual practitioner acting in the usual course of his

professional practice."

13.     Title 18, United States Code, Section 1347 prohibits any person from knowingly

and willfully executing, or attempting to execute, a scheme or artifice (1) to defraud any health

---

[1]     The government does not concede that a search warrant is needed to obtain the records sought from the PDMP.  That issue is the subject of current pending litigation between the United States and the State.  *See U.S. Dep't of Justice v. Ricco Jonas*, Case No. 18-mc-56-LM (D.N.H.).

care benefit program, or (2) to obtain, by means of materially false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of any health care benefit program, in connection with the delivery or payment for health care benefits, items or services.  The prescribing of controlled substances that are not medically necessary to patients, where such prescriptions are then paid for by Medicare or private insurance, can violate § 1347.

14.     The drugs and other substances that are considered controlled substances under the Controlled Substances Act are divided into five schedules:

Schedule I:  Substances in this schedule have no currently accepted medical use in treatment in the United States (e.g., Heroin).

Schedule II:  Substances in this schedule have a high potential for abuse with severe psychological or physical dependence (e.g., oxycodone, hydromorphone, fentanyl).

Schedule III: Substances in this schedule have a potential for abuse less than substances in Schedule I and II (e.g., Vicodin, anabolic steroids, Buprenorphine, Suboxone).

Schedule IV:  Substances in this schedule have a potential for abuse less than substances in Schedule III (e.g., alprazolam, clonazepam).

Schedule V:  Substances in this schedule have a potential for abuse less than substances in Schedule IV (e.g., Robitussin AC)

**INVESTIGATION OF DR. JOHN FOTHERGILL**

15.     This investigation began in approximately 2015 when DEA was contacted by law enforcement officers in Colebrook, New Hampshire, and neighboring jurisdictions that were concerned about what they believed to be excessive prescribing of opioid medication (including

oxycodone) by Dr. Fothergill at Indian Stream Health Center ("Indian Stream") in Colebrook,

NH.  Their concerns originated from separate contacts they had with patients of Dr. Fothergill.

16.     During the investigation, interviews of current and former staff at Indian Stream,

interviews with Pharmacists at Rite Aid Pharmacy in Colebrook, NH, and Indian Stream's

pharmacy, and interviews of former patients of Dr. Fothergill, revealed Dr. Fothergill's

prescribing of opioids to be excessive and outside of usual and normal medical practice.  As of

August 7, 2017, Dr. Fothergill resigned and was no longer employed at Indian Stream. In

December 2017, however, Dr. Fothergill assisted in opening a new clinic, North Country

Medical & Wellness ("NCMW") in Colebrook, NH.   Dr. Fothergill is now the sole physician

working at NCMW and continues to prescribe narcotics and provide substance abuse treatment

through the prescribing of Buprenorphine (Suboxone).

17.     On August 27, 2015, while he was still employed at Indian Stream, Dr. Fothergill

requested and was issued a Unique Identification Number[2] ("UIN") from the DEA authorizing

him to administer, dispense and prescribe Schedule III Narcotic Controlled Substances, namely

Buprenorphine drug products, for use in the maintenance and detoxification treatment of his

patients. Accordingly, Dr. Fothergill has the authority to prescribe Buprenorphine products to up

to thirty patients for the purpose of treating any drug addiction that they might have. At present,

---

[2] On October 17, 2000, the Drug Addiction Treatment Act of 2000 was passed, which amended the
Controlled Substance Act, 21 U.S.C. § 823(g).  This act waived the DEA's separate registration
requirement for narcotic treatment programs. Practitioners who have obtained the proper approval from
the Department of Health and Human Services - Center for Substance Abuse can be issued a UIN from
the DEA authorizing them to administer, dispense and prescribe Schedule III narcotic controlled
substances, namely Buprenorphine drug products for use in maintenance and detoxification treatment.
The granting of a UIN does not equate with authorization to run a drug treatment program. Rather, it
simply authorizes a physician to prescribe certain drugs to his or her patients for the treatment of drug
addiction. In addition, ordinarily the physician can prescribe these drugs only to a maximum of thirty
patients at any given time.

the exact number of prescriptions written by Dr. Fothergill for Buprenorphine products is not known, though it is believed from confidential source information that a limited number of Dr. Fothergill's patients are being treated in this fashion.

**Analysis of PDMP Claims and Board of Pharmacy Inspection**

18.     A Federal search warrant was served on the New Hampshire Prescription Drug Monitoring Program (PDMP) on June 1, 2017.  The warrant requested schedule II prescription drug data pertaining to Dr. John Fothergill.  The data returned included prescription drug data from January 1, 2016 through May 30, 2017.

19.     The PDMP data indicated that during the period mentioned above Dr. Fothergill wrote 3023 prescriptions for schedule II drugs to 381 unique patients.  The quantity of pills equates to 254,319.

20.     In a June 2017 meeting, representatives from the New Hampshire Board of Pharmacy discussed a routine inspection in May 2017 of Indian Stream and the Indian Stream Pharmacy.  Their observations included seeing an astronomical quantity of Schedule II controlled substances being prescribed by the clinic, including by Dr. Fothergill.  During the meeting, the Board of Pharmacy expressed their concern regarding prescribing practices at Indian Stream.

**INTERVIEW OF SOI-1**

21.     In a July 2017 interview with a confidential source of information ("SOI-1"), who was a medical provider at Indian Stream from March 2016 through October 2017, SOI-1 stated

8

that 80% of the files for Dr. Fothergill's patients who were receiving narcotics contain no supporting documentation for the prescription they are receiving.

22.     According to SOI-1, a patient in Errol, N.H. was receiving a thousand and eight pills (1008) per month from Dr. Fothergill.  SOI-1 stated that for a person to receive this quantity of narcotics they should be a cancer patient and this patient was not. SOI-1 stated that the patient's file included no diagnostic testing, such as X-rays, MRI's, or CT scans to support the narcotic prescriptions.

22. SOI-1 stated that he/she knows of (8) eight different families who are receiving the same prescription and dosage from Dr. Fothergill every 28 days and said that there is no diagnostic support for these families receiving these prescriptions.  SOI-1 stated that he/she told one of Dr. Fothergill's patients that they needed to get some diagnostic imaging, along with a urine sample, in order to keep receiving their current narcotic prescription. The patient refused to give a urine sample, and refused to get the required diagnostic imaging. SOI-1 stated that Dr. Fothergill continued to prescribe narcotics to this patient despite the patient's refusal to obtain the necessary testing.

**INTERVIEW OF SOI-2**

23.  SOI-2 was interviewed in May 2018.  SOI-2 was a medical provider at Indian Stream for approximately eight years and indicated Dr. Fothergill had effectively two types of patients that he would see:  either elderly patients or pain patients. SOI-2 advised that he/she observed that Dr. Fothergill's elderly patients were not prescribed narcotics; however 100% of Dr. Fothergill's younger pain patients were on narcotics. SOI-2 indicated that there were a lot of overdose deaths during his/her employment at Indian Stream and he/she felt they were attributed

Dr. Fothergill's prescriptions.  SOI-2 indicated that out of 100 patients receiving narcotics, only about 10 of those prescriptions were for legitimate medical purposes for patients who actually needed the prescription.

24.  SOI-2 indicated that a patient of Dr. Fothergill would show up in the lobby of Indian Stream so drugged out that he could not even speak. SOI-2 indicated that all the nurses were extremely concerned about this patient's driving to the clinic because he was so over medicated. SOI-2 further indicated that each time this patient showed up at the clinic, Dr. Fothergill would give him a shot of Demerol. According to SOI-2, he/she would advise Dr. Fothergill to not give the patient Demerol, but Dr. Fothergill would do it anyway, stating "Just give it to him to get him out of here."

25.  SOI-2 stated that many of Dr. Fothergill' s patients would undergo diagnostic testing that revealed no problems or injuries; however, Dr. Fothergill continued to prescribe narcotics to these patients.

**INTERVIEW OF SOI-3**

26.  SOI-3 was interviewed in February 2018.  SOI-3 was a medical provider at Indian Stream from 2006 until 2013 and from 2014 until the present date.  SOI-3 stated that for years he/she had been extremely concerned about Dr. Fothergill's overprescribing.  SOI-3 indicated that he/she was concerned some of the patients would or could die because of the amounts of opioids they were being prescribed.  SOI-3 indicated that there were several overdose deaths that he/she was very concerned about, and he/she attributed their deaths to Dr. Fothergill's overprescribing.

27.     SOI-3 stated that a lot of patients were selling their medications on the street and the staff at Indian Stream knew it.  However, when the information was passed on to Dr. Fothergill, the patients were not held accountable and continued to receive successive prescriptions of narcotics.

**INTERVIEW OF SOI-4**

28.     SOI-4, Indian Stream's in-house pharmacist, was interviewed on October 11, 2017.  Indian Stream operates a pharmacy in the lower-level of the building.  SOI-4 stated that he/she had been concerned with the quantity of dosages written on prescriptions for Dr. Fothergill, and that he/she had started to see a pattern in the first couple of months working at Indian Stream.  SOI-4 said the doses were higher than he/she had seen in comparison to other places he/she had worked, and the quantities were larger as well.  SOI-4 stated some large amounts of prescriptions he/she saw were for Oxycodone 30mg, 224 pills for a 28-day supply; typically the prescription would say 1 tablet every 4-6 hours but sometimes the prescription would say 10 tablets maximum per day. SOI-4 said Dr. Fothergill was prescribing a lot of Oxycodone and Methadone together in large quantities.

29.     SOI-4 stated that on prescriptions for Methadone it would indicate "for chronic pain," because Methadone prescriptions are required to have that phrase written on them if they are not for addiction treatment. SOI-4 stated he/she was not aware if the doctors at Indian Stream were writing Methadone prescriptions for patients to help with opioid addiction and fraudulently writing a diagnosis "for pain" on the prescriptions. SOI-4 stated that, in his/her opinion, Methadone was a "bad drug" for pain because there is a large variation in dosages for Methadone. SOI-4 said Methadone is not intended to be used as an extended release drug for pain. SOI-4 was concerned but stated he/she did not feel he/she could raise the issue with Dr.

11

Fothergill, especially because it was apparent he had been prescribing this way for a long time. SOI-4 said Methadone was a cheap drug and an old way of treating pain.

30.     SOI-4 stated there was nothing he/she could do about his/her concerns about the amount and quantities of prescriptions being written as "it fell on deaf ears." SOI-4 said he/she tried numerous times and gave up. SOI-4 stated he/she originally shared his/her concerns with other pharmacists at Indian Stream, and another Indian Stream Pharmacist said he/she had gone directly to Dr. Fothergill and he did not care.

**INTERVIEW OF SOI-5**

31.  SOI-5, a physician employed at Indian stream since 2006, was interviewed in December 2017.  SOI-5 said that after Indian Stream became aware of the Federal investigation, and around the same time Dr. Fothergill departed his employment at Indian Stream, Indian Stream began a process to wean patients on high doses of opiates down to lower levels.  Indian Stream used Morphine Milligram Equivalents (MME) calculations to wean patients.

32.     After Dr. Fothergill left Indian Stream, SOI-5 inherited a large number of Dr. Fothergill's patients.  SOI-5 said some of Dr. Fothergill's patients were on higher doses of narcotics than he/she would have prescribed.  SOI-5 also said some of Dr. Fothergill's patients being prescribed narcotics had no urine drug screens at all or had not received one in a long time. SOI-5 did conduct urine drug screens on these patients and the results were "not appropriate." SOI-5 discontinued prescribing narcotics to these patients.

33.  SOI-5 said that since Dr. Fothergill started working at NCMW many of Dr. Fothergill's former Indian Stream patients, whose narcotic prescriptions were weaned to lower MME's, have left Indian Stream to receive treatment from Dr. Fothergill at the new clinic.

34.     SOI-5 said Dr. Fothergill is resistant to lowering opiate prescriptions.  SOI-5 said that a pharmacist at Rite Aid in Colebrook told SOI-5 that Dr. Fothergill has put these patients back on very high doses of opiates and the Rite Aid pharmacist is refusing to fill the prescriptions because he/she deems them inappropriate.  SOI-5 said he/she is very concerned about this situation because SOI-5 made a lot of progress weaning these patients to lower opiate levels after Dr. Fothergill left Indian Stream.

**INTERVIEWS OF SOI-6**

35.     SOI-6, a pharmacist at Rite Aid in Colebrook, New Hampshire, was interviewed in December 2017.  SOI-6 was working at the pharmacy on 11/26/17 (shortly before NCMW opened for business) when a patient AW pulled in to the drive-through.  SOI-6 stated that AW tried to pass a prescription for 15mg Oxycodone written by Dr. Fothergill.  SOI-6 noticed the prescription was written on a prescription pad that looked 15 years old or older.  SOI-6 refused to fill the prescription due to the age of the prescription pad and the circumstances surrounding the prescription.  SOI-6 said Dr. Fothergill contacted him/her later that day and questioned why the prescription was being refused. SOI-6 stated he/she informed Dr. Fothergill the prescription was written on a non-legitimate prescription pad, so he/she refused to fill it. SOI-6 also asked Dr. Fothergill how he was writing prescriptions because his new medical practice was not scheduled to open until December 1, 2017. According to SOI-6, Dr. Fothergill indicated he saw the patient at the new medical practice because he was holding a soft opening. SOI-6 told Dr. Fothergill he/she was going to refuse to fill the prescription.   SOI-6 said he/she was at the Colebrook Post Office the following day (11/27/17) when Dr. Fothergill approached him/her and apologized for his behavior and demeanor the previous day.

36.  SOI-6 said that since its opening earlier that month, NCMW was writing less than one non-narcotic prescription per day, and the majority of NCMW's prescriptions filled at Rite-Aid were for narcotics.  SOI-6 said that since NCMW has opened, he/she has noticed many of Dr. Fothergill's former patients from Indian Stream, who had been weaned down or off their medications since Dr. Fothergill's resignation from Indian Stream in August 2017, have returned to their former dosage and quantity of pills after only one visit with Dr. Fothergill at the new practice.

37.  SOI-6 was interviewed again on March 9, 2018.  SOI-6 believes Dr. Fothergill is running a pill mill at NCMW.  SOI-6 said that when Dr. Fothergill left Indian Stream he/she and the other Rite Aid pharmacist noticed a huge decrease in the amount of Schedule II narcotics that were being filled at the Rite Aid in Colebrook.  SOI-6 had conversations with providers at Indian Stream who told SOI-6 the decrease in narcotics was part of an effort to wean patients to lower narcotic dosages and in some cases to get patients off of narcotics entirely.

38.  SOI-6 indicated that in December 2017 when Dr. Fothergill opened his new business he/she observed patients who, after their first visit with Dr. Fothergill, arrived at Rite Aid with narcotic prescriptions at the same high dosage and quantity levels that they were on when they saw Dr. Fothergill at Indian Stream.  According to SOI-6, these patients did not receive urine drug screens or pill counts, but were put right back onto high dosages of narcotics by Dr. Fothergill. SOI-6 indicated patients who were weaned down to Oxycodone 2 to 3 times per day were pushed back up to six 30mg Oxycodone per day. SOI-6 indicated that this amount of medication equated to 180mg of Oxycodone per day, which results in a patient receiving 5400mg of Oxycodone in a 28-day period. SOI-6 indicated this amount of medication "is crazy for any human being to consume."

39.	SOI-6 indicated that if a physician wanted to do something good for these patients he would cut them back to two 30mg Oxycodone a day, which would be cutting the monthly intake of Oxycodone by these patients to one third.  SOI-6 stated that at this point if patients are receiving that much Oxycodone per day, it indicates the medication is not working, and the provider should consider other alternatives.

40.	SOI-6 explained that from July 2016 until early December 2017, when Indian Stream started weaning patients from their high narcotic prescriptions, and before Dr. Fothergill started practicing at NCMW, patients physically looked better when they came into the pharmacy and the patients told SOI-6 they felt better.

41.	SOI-6 indicated that Dr. Fothergill would never allow him/her, or the other pharmacist, to discuss prescriptions and pharmacist recommendations. SOI-6 indicated that the pharmacist could not make any recommendations to Dr. Fothergill, and if the prescription was questioned, he would call the pharmacist and order him/her to fill the prescription. SOI-6 explained that in their 20 years of working at Rite Aid he/she could never remember Dr. Fothergill taking a recommendation from him/her.  SOI-6 said Dr. Fothergill is very forceful with his words, intimidating, and untrustworthy.

42.	SOI-6 said if Dr. Fothergill is called about a prescription the pharmacist feels is wrong he is very reluctant to listen.  In most cases Dr. Fothergill puts the patient right back up to the dosages he wants them on despite the fact that the patient had been weaned down from high narcotic prescriptions.  SOI-6 recalled a recent exchange with Dr. Fothergill regarding a prescription he had written for two patients who had been weaned to 30mg of Oxycodone per day, and on their first visit with Dr. Fothergill at NCMW, they were returned to six 30mg Oxycodone per day along with Dilaudid and Xanax. SOI-6 told Dr. Fothergill he was going to

kill these people if he put them back on that much medication. Dr. Fothergill advised SOI-6 that he would taper them back to where he wanted them to be. SOI-6 indicated that these two patients are now back on the narcotic regimen they were on before Dr. Fothergill resigned from Indian Stream.

43. SOI-6 indicated that he/she heard that Dr. Fothergill is currently treating approximately 200 patients at NCMW who he formerly treated at Indian Stream. SOI-6 went on to explain that out of 100 prescriptions he/she fills for pain about 80 of them are prescribed by Dr. Fothergill. SOI-6 said, "I would like to stop filling all prescriptions from Dr. Fothergill."

44. During the 3/9/18 interview SOI-6 produced two thumb drives containing video of a male patient identified as PD who appeared to be high on some type of Narcotic. According to SOI-6 this patient came into Rite Aid seeking a prescription for Gabapentin that was written by Dr. Fothergill at NCMW. SOI-6 indicated that due to the apparent condition of the patient Rite Aid initially felt the prescription should not be filled, however the prescription was subsequently filled that day at Rite Aid. SOI-6 indicated that on 03-02-18, PD came into Rite Aid to fill a prescription for Methadone, and according to SOI-6 was acting quite normal. On 3/16/18, PD came back to Rite Aid with another prescription for Methadone, as well as a prescription for an increased amount of Gabapentin for pain. SOI-6 said the prescription for Methadone did not have the words for "treatment of pain" or "chronic pain," so SOI-6 refused to fill the prescription at that time. SOI-6 said a short time later PD came back into Rite Aid with a prescription written by Dr. Fothergill that had "Chronic pain" written on the prescription. SOI-6 indicated that this type of behavior indicates that Dr. Fothergill is writing prescriptions for Methadone for the treatment of addiction and not for the treatment of pain.

45. SOI-6 was again interviewed on October 3, 2018. SOI-6 explained that on

July 27, 2018 he/she had received a telephone call from Weeks Medical Center in North Stratford, NH regarding a patient named FS. SOI-6 indicated that he/she was informed that FS was released from the Weeks Medical Center in part for failing urine drug screens. SOI-6 was told to be on the lookout for this patient showing up at the Rite Aid in Colebrook, looking to fill a possible prescription for Oxycodone. A couple of hours after SOI-6 was notified, FS appeared at the pharmacy window at Rite-Aid in Colebrook, NH, with a prescription from Dr. Fothergill. The prescription was for the same medication FS was receiving from Weeks Medical Center, and for a higher dosage. SOI-6 indicated that, after what was apparently FS's first visit to Dr. Fothergill, FS was receiving 20mg Oxycodone pills to be taken four times per day, was a higher dosage than FS received at the previous clinic.

46.     SOI-6 was again interviewed on October 6, 2018. SOI-6 said that he/she had spoken with an employee of Indian Stream Health Center who indicated to him/ her that over the past week or so several patients had left Indian Stream because they are not permitted to continue to receive high dosages of opioids from one of the physicians now at Indian Stream. According to SOI-6, patients who are used to having large amounts of opioids prescribed to them daily are now leaving Indian Stream and are going to see Dr. Fothergill. These patients are now showing up at Rite-Aid and are not only getting the same prescription from Dr. Fothergill, but the prescription is also at a higher dosage then they were receiving at Indian Stream.

47.     SOI-6 compiled an analysis of narcotics prescribed by Dr. Fothergill that were filled at Rite Aid in Colebrook, NH, in the one-month period from June 9, 2018, through July 9, 2018. According to SOI-6's analysis, during that period Dr. Fothergill wrote 27% of all Fentanyl

prescriptions filled; 38% of all Hydromorphone prescriptions filled; 25% of all Hydrocodone prescriptions filled; 65% of all Methadone prescriptions filled; 56% of all Morphine IR prescriptions filled; 55% of all Morphine ER prescriptions filled; 36% of all Oxycodone/APAP prescriptions filled; 44% of all Oxycodone prescriptions filled; 29% of all Oxycontin prescriptions filled.  In addition, during the period in question Dr. Fothergill was the only prescriber of Suboxone prescriptions filled at the Colebrook Rite Aid, and wrote 56 prescriptions for Suboxone for 39 total patients.

## ANALYSIS OF MEDICARE CLAIMS

48.  An analysis of Medicare claims from NCMW indicates that as of December 1, 2017 through August 31, 2018, Dr. Fothergill was prescribing controlled substances to 97 Medicare patients.  Of the 97 patients, 5 patients have not had any office visits billed to Medicare with Dr. Fothergill or with any other provider at NCMW since December 1, 2017.   Thus, it appears that at least for those 5 patients, Dr. Fothergill is continuing to write prescriptions for controlled substances without seeing the patient since his days at Indian Stream ended in August 2017.   A further analysis shows that of the 97 current NCMW patients insured through Medicare, 53 of the patients were treated by Dr. Fothergill when he worked at Indian Stream Health Center.

## ANALYSIS OF MEDICAID CLAIMS

49.  An analysis of Medicaid claims indicates that as of December 1, 2017 through at least August 31, 2018, Dr. Fothergill was prescribing controlled substances to 43 Medicaid patients.  Of the 43 Medicaid patients, 13 patients have not had any office visits billed to Medicaid with Dr. Fothergill or with any other provider at NCMW since December 1, 2017.   Of the same 43 patients, 13 patients, separate and distinct from the 13 patients with no office visits,

were prescribed controlled substances months before having an office visit with Dr. Fothergill or any other provider at NCMW.  Therefore, these 13 patients were prescribed controlled substances by Dr. Fothergill without being seen by him first for an office visit.

50.      Of the 43 Medicaid patients to whom Dr. Fothergill is prescribing controlled substances at NCMW, since the practice opened for business, 25 were formerly patients at Indian Stream Health Center when Dr. Fothergill was employed there.

## DRUG SALES BY DR. FOTHERGILL'S PATIENTS

51.      On April 25, 2018, in an undercover drug buy, DEA bought eight orange-colored Suboxone strips from ES.  ES was a patient of Dr. Fothergill, who was prescribing this medication to ES.  ES's girlfriend, BB, also a patient of Dr. Fothergill, participated in the drug sale. Medicaid has paid for Suboxone prescribed by Dr. Fothergill for BB.  DEA made additional drug purchases from patients of Dr. Fothergill, selling drugs prescribed by Dr. Fothergill, as follows:  (1) April 26, 2018, four orange-colored Suboxone strips from patient BB; (2) April 26, 2018, four orange colored Suboxone strips from patient ES; (3) May 11, 2018, one orange-colored Suboxone strip from patient TS.  Medicaid has paid for Suboxone prescribed by Dr. Fothergill for TS; and (4) June 13, 2018, two orange-colored oval Subutex pills from patient HR. Medicaid has paid for Suboxone prescribed by Dr. Fothergill for HR.

## CONCLUSION

52.  New Hampshire requires that medication be "prescribed as part of the course of medical treatment for a specific illness, injury, or disease..."  N.H. Admin. Rules, He-W 570.04(a).  Based on the aforementioned facts, there is reason to believe that Dr. Fothergill is not prescribing controlled substances as part of the course of medical treatment.  In my training and experience, Dr. Fothergill's prescribing practices are highly unusual.  I believe that the PDMP information is necessary to further identify the amount and type of controlled substances that Dr. Fothergill is prescribing.

53. There is probable cause to believe that the New Hampshire PDMP now contains records and data regarding prescriptions written by Dr. John Fothergill, from December 1, 2017, through the present, which constitutes evidence of the federal offenses of health care fraud and unlawful dispensing of controlled substances.

/s/ Erika Broadhurst
Erika Broadhurst
Special Agent, HHS-OIG

Sworn and subscribed before me this __26th___ day of  October, 2018.

Honorable Andrea K. Johnstone
United States Magistrate Judge
District of New Hampshire